UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JEFFREY WALLACE | * | CIVIL ACTION |
| VERSUS | * | NO:  99-504 &<br>CONSOLIDATED CASES |
| TERRY DEAN KING, M.D., ET AL | * | SECTION: "D"(5) |

### O R D E R

Before the court are the following motions filed by Nominal
Defendant, Terry King, M.D., and the Louisiana Patient's
Compensation Fund and Oversight Board (collectively referred to as
the PCF):

(1)  "Motion to Exclude Causation Testimony of Dr.
Phillip Walson" (Doc. No. 312);

(2)  "Motion to Exclude All Computer Modeling Relied
Upon by Dr. Philip Walson" (Doc. No. 311);

(3)  "Motion for Partial Summary Judgment" (Doc. No.
309);

(4)  "Motion to Exclude Any Evidence of Alleged Lack of
Informed Consent or of an Alleged Conspiracy by Dr.
King" (Doc. No. 310); and

___ Fee_____<br>___ Process_____<br>_X_ Dktd_____<br>___ CtRmDep_____<br>___ Doc. No._____

(5)  "Motion to Strike *Lejeune* Claim" (Doc. No. 313).[1]

Plaintiff, Jeffrey Wallace, filed memoranda in opposition to these motions.  The motions are before the court on briefs, without oral argument.  Now, having considered the memoranda of counsel, the record, and the applicable law, the court rules as follows.

## (1)  PCF's "Motion to Exclude Causation Testimony of Dr. Phillip Walson" (Doc. No. 312)

In this motion, the PCF argues that Dr. Walson's "causation" testimony should be excluded because, as a pharmacologist, he is not qualified to render testimony as to the cause of death in this case which involved a cardiac arrhythmia.  Dr. Walson is a board certified in pediatrics, medical toxicology and clinical pharmacology.  (Walson Dep. at 9).  As reflected in the following testimony, Dr. Walson is a key expert for the Plaintiff:

> My opinion, based on my review of the materials provided concerning this case, as well as my training, common experience and literature evaluation, Mrs. Wallace's tragic death was within a reasonable medical certainty the result of her digoxin[2] and

---

[1]  The court also has the PCF's **"Motion to Exclude Cynthia Benz as a Witness" (Doc. No.342)** set for hearing on August 31, 2005, with Plaintiff's opposition due on August 29, 2005.  The court will promptly rule after receiving Plaintiff's opposition.

Further, the court has Plaintiffs' Motions in Limine (Docs. Nos. 308 & 314) set for hearing on August 31, 2005, and the court will issue a ruling on these motions shortly.

[2]  Digoxin is also referred to as Lanoxin, the brand name for Digoxin), and the two names may be used interchangeably in this litigation.

amiodarone[3] dosing.

(Walson Dep. at 93).

In urging the court to have this crucial causation testimony excluded, the PCF contends that Dr. Walson (who is not a cardiologist) cannot determine, among the list of possibilities, the type of arrhythmia that caused Mrs. Wallace's death.  The PCF argues that other "possibilities" of the cause of Mrs. Wallace's death are unrelated to the alleged incorrect dosing of digoxin and amiodarone and include "her failure to choose an automatic defibrillator" and "she may have had a pro-arrhythmic response to the Amiodarone that was not detectable at the time of her admission."  (PCF's Memo. at 7).  Thus, the PCF maintains that as a non-cardiologist, Dr. Walson "is unable to make a valid differential cardiac diagnosis, and therefore, the only scientific methodology available to him is inherently flawed."  (PCF's Reply at 1).[4]

The court rejects the PCF's argument.  Having considered Dr. Walson's qualifications and the methodology he used in formulating

---

[3]   "Cordarone" is the name brand of "amiodarone," and the two names may be used interchangeably in this litigation.

[4]   While the PCF admits that "[n]o one is disputing that Ms. Wallace, with her severe complex congenital heart disease, probably dies from a cardiac arrhythmia," and that Dr. Walson states that she died from a "cardiac arrhythmia," the PCF argues that as a non-cardiologist, Dr. Walson cannot establish what type of arrhythmia (bradycardia or malignant arrhythmia) caused Ms. Wallace's death.  (PCF's Reply at 2).

in opinion, the court finds that under *Daubert*,[5] Dr. Walson's testimony regarding "the causal effect of interaction of digoxin and amiodarone on Mrs. Wallace" is both reliable and relevant. It will be up to the jury to weigh Dr. Walson's testimony, with all the other testimony (from cardiologists and others) and evidence offered at Trial.

Thus, the court will deny the PCF's **"Motion to Exclude Causation Testimony of Dr. Phillip Walson."**

## (2) "Motion to Exclude All Computer Modeling Relied Upon by Dr. Philip Walson" (Doc. No. 311)

Plaintiff's pharmacology expert, Dr. Walson, used computer modeling to show how plasma concentrations of amiodarone and digoxin are expected to occur in the human body when different doses of amiodarone and digoxin are taken at various points and time. In this motion, the PCF argues that the computer modeling is "entirely unreliable and cannot assist the trier of fact as demonstrated by plaintiff's other pharmacological expert [Dr. Hilleman] and the PCF's pharmacology/toxicology experts [Dr David Matthews and Dr. Jorge Martinez]." (PCF's Memo. at 1).

To the extent that the PCF argues that the computer modeling is inadmissible based on what Dr. Walson has said in his deposition and reports, the court finds the PCF's motion premature because

---

[5]   *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (193).

4

Plaintiff states that he will "at the time of trial, lay the proper foundation to establish the admissibility of [the computer modeling] in accordance with the Federal Rules of Evidence." (Plaintiff's Opp. at 5). Further, the court rejects the PCF's argument that Plaintiff is attempting to use Dr. Vinks (who helped Dr. Walson prepare the computer modeling), an unlisted expert, through Dr. Walson. The PCF could have, but did not, take his deposition to ascertain Dr. Vinks role in the computer modeling.

The court also finds the opinion of other experts in this case regarding the computer modeling irrelevant as to whether or not the computer modeling should be excluded. Finally, under Federal Rule of Evidence 403, the court does not find that the probative value of the computer modeling is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

Thus, the court will deny the PCF's **"Motion to Exclude All Computer Modeling Relied Upon by Dr. Philip Walson."**

### (3) "Motion for Partial Summary Judgment" (Doc. No. 309)

In Plaintiff's Original Complaint (which consists of 39 enumerated paragraphs), Plaintiff alleges in Paragraphs 30 and 31:

> 30.
> [T]he Patient [Ms. Wallace] did not receive the amount of medication required by her condition. One day after her discharge from West Jefferson Hospital, she suffered a fatal arrhythmia/dysrhythmia which was caused by the improper amount of medication received by the Patient.

31.

> Alternatively, if it determined that the
> Patient took one dose of 800 mg per day, as
> defendants contend she should have taken, and
> as Doctor King and Nurse McGriff purportedly
> instructed the Patient, the strength of this
> single dose far exceeded the strength of any
> single dose the Patient was able to take
> because of her condition.   The Patient's
> condition required her to take two daily doses
> of 400 mg each and not one single dose of 800
> mg.  The large dose caused and/or contributed
> to the fatal arrhythmia/dysrhythmia that took
> the Patient's life.

(*See* Original Complaint, attached to the PCF's Motion as Exhibit B).

In Plaintiff's "Supplemental and Amending Complaint," Plaintiff supplemented and amended his original Complaint to add Paragraphs 40-89.  In Paragraph 82, Plaintiff alleges:

> The probable cause of the Patient's death was
> a ventricular arrhythmia or ventricular
> tachycardia (which developed into ventricular
> fibrillation) brought about by (1) an adverse
> reaction to amiodarone intake of 800 mg in one
> single dose or (2) by digoxin toxicity induced
> by the combined therapy of amiodarone
> (Cordarone) and digoxin (Lanoxin) in the wrong
> amounts.

(*See* Supplemental and Amending Complaint, attached to the PCF's Response as Exhibit 2).

In its Motion for Partial Summary Judgment, the PCF seeks dismissal of Plaintiff's claim that Dr. King's mistake of prescribing of one single dose of 800 mg of amiodarone caused and/or contributed to Ms. Wallace's death.[6]  The PCF maintains that

---

[6]   The PCF does not seek summary judgment dismissal of Plaintiff's claim that the interaction of Amiodarone and digoxin caused Ms. Wallace's death.

6

Plaintiff lacks the necessary expert testimony to support this claim, and cites the following deposition testimony from Plaintiff's pharmacy expert, David Hilleman, PhD, and Plaintiff's pharmacologist, Dr. Philip Walson (at pp. 194-95).

Regarding the single dosing of 800 mg of Amiodarone, Dr. Hilleman testified:

> A.   [T]he biggest problem that I had that I felt put this particular patient in jeopardy was the failure to adjust the [digoxin] dose in a timely manner and to monitor the patient more carefully after they had added the Amiodarone on top of the [digoxin]. There were some discussions about the prescription being improperly labeled and filled and I -- I didn't feel that that was an issue that ultimately could have had a significant impact on the outcome, so **I have no opinion as far as that is concerned, you know, being outside the scope of the practice.**
>
> Q.   And that would include the single dosing of the Amiodarone of 800 milligrams after discharge?
>
> A.   That is correct.
>
> Q.   That was one of areas that [Plaintiff's attorney] raised as a potential problem and you basically said that's not my concern, what my concern more is the dig/Amiodarone interact?
>
> A.   That is correct.

(Hilleman Dep. at 80)(emphasis added)

The court finds that the PCF's reliance on Hilleman's testimony is misplaced because the effect of the single dosing of 800 mg of Amiodarone was outside of Dr. Hilleman's expertise.

In the testimony of Dr. Walson which the PCF cites, Dr. Walson testified:

> Q.   [Y]ou have an opinion, I think in one of your reports, about the 800 milligram dose all at once?

. . .

A.   Only that what it does is produce a more rapid rate of change of concentration and that it models--when you model it, it produces a concentration similar to what she had when she had arrhythmias after days of smaller incremental doses.  So was it a major issue in her arrhythmia?  I don't think it's the major issue.

Q.   In fact, even the PDR says you can give undivided doses up to 1,000 milligrams; is that right?

A.   Again, the problem with it is you wouldn't do it to someone who--because if you get in trouble with amiodarone, you would rather get in trouble with a smaller dose.  **So it has some effect**, but it's not the major issue in this case.

Q.   And it's not generally a deviation in the standard of care in prescribing it all at once as long as it's under 1,000 milligrams?

A.   **That I'm not so sure I could say.**  Again the problem here is that this is a patient's who's getting in trouble with smaller incremental doses. I don't think it's safe to go--you monitoring someone on three doses a day and then you switch them suddenly to one, **it's risky, but it's not more likely than not related to the cause of death.**

(Walson Dep. at 195-95)(emphasis added).

But Dr. Walson previously testified in his deposition:

Q.   But she [Ms. Wallace] was at sudden risk of death?

A.   Absolutely.

Q.   Because of her condition?

A.   Because of her condition.  Because of the fact that she had--not only did she have a heart disease, she had EP evidence that she had sustainable ventricular tachy arrhythmias so that she was statistically at great risk.  That's one of the reasons she needed t be in the hospital.

Q.   So you can't say that she had an arrhythmia due to digoxin toxicity, but you think she had an arrhythmia?

8

A.   I think that **both digoxin and amiodarone contributed to her arrhythmia.  I don't know which one of them or, in fact, if one alone was enough.**

Q.   What do you base that on?  I mean, I know you have opinions about the levels and so forth, but we don't have a level in this case.  So how can you say the arrhythmias she had that killed her was a result of the drug interaction as opposed to her disease?

A.   Again, I'm not saying--I'm just saying more likely than not.  It fits the pattern that I showed you on modeling amiodarone concentrations.  It fits the fact that we know that digoxin has a known well-documented interaction with amiodarone.  We know that she had been stable for a long time....I can just say more likely than not--you know, it explains what happens better than the alternate explanation.  To say, well, it just happened is to ignore her course, her bradycardic episodes, what happened to her when they held the dose.  Yes, a lot of things are possible, but it's just not more likely than not and I think **the more likelier than not is the amiodarone and dig -- and I can't say which -- and the dosing and the lack of monitoring was a cause of death.**

(Walson Dep. at 191-92)(emphasis added).

The court concludes that based on this expert testimony, there is a genuine issue of material fact as to whether or not the single dosing of 800 mg of Amiodarone at least "contributed" to Ms. Wallace's death.

Thus, the court will deny the PCF's **"Motion for Partial Summary Judgment.**

9

(4)   **"Motion to Exclude Any Evidence of Alleged Lack of Informed**
      **Consent or of an Alleged Conspiracy by Dr. King" (Doc. No.**
      **310)**

In this motion, the PCF moves to exclude evidence of lack of informed consent or of an alleged conspiracy by Dr. King because such evidence pertains to no cause of action filed in this case. Plaintiff did not raise allegations of lack of informed consent or of conspiracy until eight years after his first complaint, when the Pre-Trial Order was filed on July 28, 2005 (less than six weeks prior to Trial). Thus, the PCF's motion has merit, subject to the following caveat.

With regard to the lack of informed consent issue, the court notes that in the PCF's memorandum in support of its "Motion to Exclude Causation Testimony of Dr. Phillip Walson," the PCF argues that one possibility of the cause of Mrs. Wallace's death (unrelated to the alleged incorrect dosing of digoxin and amiodarone) includes "her failure to choose an automatic defibrillator." (*See* discussion, *supra*, p. 3). *If* the PCF elicits expert testimony that Ms. Wallace was adequately informed of her choices (i.e., Amiodarone or an automatic defibrillator) and she chose Amiodarone, then Plaintiff will be entitled to present evidence relevant to this issue.

Thus, the court will grant the PCF's **"Motion to Exclude Any Evidence of Alleged Lack of Informed Consent or of an Alleged Conspiracy by Dr. King."** With regard to the lack of informed

10

consent issue, Plaintiff will not be allowed to introduce any testimony or evidence pertaining to Dr. King's alleged failure to inform Ms. Wallace of the effects and risks of any medication and lack of protection at the time of discharge, but *if* the PCF elicits expert testimony that Ms. Wallace was adequately informed of her choices (i.e., Amiodarone or an automatic defibrillator) and she chose Amiodarone, then Plaintiff will be entitled to present evidence relevant to this issue.

### (5)   "Motion to Strike *Lejeune* Claim" (Doc. No. 313)

In *Lejeune v. Rayne Branch Hospital*, 556 So.2d 559 (La. 1990), the Louisiana Supreme Court allowed a bystander to recover damages for mental anguish and emotional distress suffered by the bystander as a result of another person's injury.[7]   In 1991, in response to *Lejeune*, the legislature enacted Louisiana Civil Code Article 2315.6 and codified the *Lejeune* test for recovery.

Under Louisiana Civil Code Article 2315.6 (A)(1), a spouse of an injured person, who views an event causing injury to that person, or who comes upon the scene of the event soon thereafter, may recover damages for mental anguish or emotional distress that he suffers as a result of the other person's injury.   Article 2315.6(B) further provides:

---

[7]      In *Lejeune*, the plaintiff's husband was hospitalized in a comatose condition.  The plaintiff entered the hospital room and observed her husband shortly after a nurse had cleaned some of the blood from wounds caused by rats chewing on her husband's face, neck and legs.  *LeJeune*, 556 So.2d 559.

> To recover for mental anguish or emotional
> distress under this Article, the injured
> person must suffer such harm that one can
> reasonably expect a person in the claimant's
> position to suffer serious mental anguish or
> emotional distress from the experience, and
> the claimant's mental anguish or emotional
> distress must be severe, debilitating, and
> foreseeable. Damages suffered as a result of
> mental anguish or emotional distress for
> injury to anther shall be recovered only in
> accordance with this Article.

La.Civ.Code Art 2316.6.

In *Trahan v. McManus*, 728 So.2d 1273 (La. 1999), the Louisiana Supreme Court was faced with whether or not parents of a deceased son could recover *Lejeune* damages in a medical malpractice case. In *Trahan*, the plaintiffs' 36-year old son (who was living with his parents) was released from an emergency hospital room after receiving medical treatment for injuries received in a one-vehicle accident. When the doctor released the patient to his mother, he assured her that her son was not seriously injured and simply needed bed rest. *Id.* at 1275.

Unfortunately, the doctor had read the wrong chart, and the patient was actually suffering from shock and internal bleeding. At home, the patient complained of severe pain to both parents, and his condition worsened. He died in the presence of his parents seven hours after his discharge from the hospital. *Id.*

The *Trahan* Court denied the parents *Lejeune* damages reasoning:

> Recovery of damages for mental anguish has
> almost never been extended to one who observed
> the victim's suffering at a place other than
> where the injury-causing event occurred or at
> a time not closely connected to the event.

12

> The requirements of Article 2315.6, when read together, suggest a need for temporal proximity between the tortious event, the victim's observable harm, and the plaintiff's mental distress arising from an awareness of the harm caused by the event. The Legislature apparently intended to allow recovery of bystander damages to compensate for the immediate shock of witnessing a traumatic event which caused the direct victim immediate harm that is severe and apparent, but not to compensate for the anguish and distress that normally accompany an injury to a loved one under all circumstances.

*Trahan*, 728 So.2d at 1279-80 (notations omitted).

In this case (factually similar to *Trahan* with regard to the *Lejeune* damages), Plaintiff allegedly watched his wife die, the day after she was discharged from the hospital.[8]  While Plaintiff certainly suffered anguish and distress as a result, he (like the parents in *Trahan)* is not entitled to recover *Lejeune* damages because he did not view an accident or an event causing injury.

Thus, the court will grant the PCF's **"Motion to Strike *Lejeune* Claim."**

---

[8]    In support of his argument that he is entitled to *Lejeune* damages, Plaintiff cites *Hubbard v. State*, 852 So.2d 1097 (La. App. 4th Cir. 2003) and *Declouet v. Orleans Parish School Board*, 715 So.2d 69 (La. App. 4th Cir. 1998).  However, Plaintiff's reliance on these two cases is misplaced, becasue unlike the Plaintiff in this case, the Plaintiffs in *Hubbard* and *Declouet* observed the victims suffering where the injury-causing event occurred.

In *Hubbard*, the mother of a child with burns sustained from an IV, saw the child only hours after the alleged malpractice and while the child was recovering in ICU.  The child was crying and agitated, and IV burn were evident on the child's skin.  852 So.2d 1097.

In *Declouet*, a student suffered a fatal asthma attack at school. The student's relatives came on the scene within minutes of the attack.  715 So.2d 69.

C O N C L U S I O N

For reasons set forth above,

**IT IS ORDERED** that the PCF's "Motion to Exclude Causation Testimony of Dr. Phillip Walson" (Doc. No. 312) be and is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the PCF's "Motion to Exclude All Computer Modeling Relied Upon by Dr. Philip Walson" (Doc. No. 311) be and is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the PCF's "Motion for Partial Summary Judgment" (Doc. No. 309) be and is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the PCF's "Motion to Exclude Any Evidence of Alleged Lack of Informed Consent or of an Alleged Conspiracy by Dr. King" (Doc. No. 310) be and is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that the PCF's "Motion to Strike *Lejeune* Claim" (Doc. No. 313) be and is hereby **GRANTED**.

New Orleans, Louisiana, this 26th day of ___August___, 2005.


A.J. McNAMARA
UNITED STATES DISTRICT JUDGE